IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GLEN CRAIG, | ) | Case No. 1:19-cv-05596 (RAG) |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF DAN BOOTH IN** |
| | ) | **SUPPORT OF DEFENDANT'S PETITION** |
| v. | ) | **FOR AN AWARD OF ATTORNEY'S FEES** |
| | ) | **UNDER 17 U.S.C. § 505 AND 28 U.S.C. § 1927** |
| POPMATTERS MEDIA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

I, Dan Booth, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am counsel for PopMatters Media, Inc. ("PopMatters"), the defendant in this lawsuit. I submit this declaration in support of its Petition for an Award of Attorney's Fees Under 17 U.S.C. § 505 and 28 U.S.C. § 1927. I have personal knowledge of all facts set forth herein, unless such facts are expressly stated upon information and belief, and would testify to those facts if required to do so in this action.

2. Glen Craig ("Craig"), the plaintiff in this action, alleges that he took a photograph of Miles Davis and owns its copyright, and that PopMatters infringed that copyright on its website. Through his attorney Richard Liebowitz ("Liebowitz"), Craig first raised his claim against PopMatters by an action filed in the Southern District of Illinois on September 11, 2018, *Craig v. PopMatters Media, Inc.*, No. 18-cv-1713 (the "first action"). A copy of the complaint from the first action is filed in this action at Docket No. 14-4. PopMatters initially retained me to defend the first action. On September 27, 2018, once PopMatters was served process, I conferred with Liebowitz by telephone, and he agreed to accept service by email of a Rule 68 offer of judgment, which I served on him by email that same afternoon. PopMatters offered to allow judgment to be entered against it for an award of damages of $800 plus all costs then accrued to which Craig was entitled, in accordance with Federal Rule of Civil Procedure 68. A true and correct copy of an email chain reflecting communications I had with Liebowitz, beginning with my

       September 27, 2018 email, is on the docket in this action at Docket No. 14-5. A true and correct copy of the offer of judgment is filed with the Petition as Exhibit A.

3. I exchanged emails with Liebowitz on October 3, 2018. He extended a $25,000 counter-offer. I responded that PopMatters "believed that the photograph of Miles Davis was a licensed publicity photo, not an infringement." To further settlement discussions, I explained that even if the use was not under license, the profits attributable to the use, if any, would have been no more than $3.42 based on advertising revenue, and that the market value for a hypothetical license for the photograph would have been $154 or less. As I reasoned, photographs that "depict Miles Davis playing trumpet onstage in the summer of 1970, in black-and-white" are comparable to the Photograph; two such photographs were available through Getty Images; Getty's online pricing utility offered licenses for their online editorial use by a publication with a circulation of up to 50,000 for $138 for one year and $146 for two years; so a license for three years would have been available for $154. I also informed Liebowitz that the Photograph had appeared on only one page of PopMatters' website, for less than two years and five months, and that according to Google Analytics, only 886 readers had viewed that page during that period, and I reasoned that a hypothetical $154 license for three years for 50,000 readers would have more than covered the extent of PopMatters' use. I asked Liebowitz to justify and substantiate his $25,000 counteroffer because, based on my calculations, it was more than 158 times greater than the total of any conceivable actual damages and profits. In response that evening, he asserted that the Photograph is "iconic," that Getty Images' licensing rates are "not relevant at all in this litigation," and that his counteroffer was "for statutory damages in line with what Courts feel is appropriate." The true and correct copy of the email chain on the docket in this action at Docket No. 14-5 includes my October 3, 2018 email exchanges with Liebowitz.

4. Liebowitz and I continued our email exchanges early on October 4, 2018. Referencing the November 8, 2014 copyright registration certificate filed in the first action, according to which Craig's Davis photographs were then unpublished, I stated that the Photograph had not had an opportunity to become iconic since then. I cited two cases in which Liebowitz had argued that licenses available through Getty Images provided a reasonable basis for calculating damages based on a hypothetical license: *Romanowicz v. Alister & Paine*, No. 17-8937 (S.D.N.Y.) and *Terry v. Masterpiece Advertising Design*, No. 17-cv-8240 (S.D.N.Y.). I further explained to him that PopMatters would move to dismiss the first action under Fed. R. Civ. P. 12(b)(2) and (3) unless he withdrew the claim, as personal jurisdiction was groundless and venue was improper downstate. He responded, offering to transfer venue. The true and correct copy of the email chain on the docket in this action at Docket No. 14-5 includes my October 4, 2018 email exchange with Liebowitz.

5. Liebowitz filed a notice of dismissal on Craig's behalf in the first action on December 17, 2018. A true and correct copy of the notice is filed in this action at Docket No. 14-12. He renewed the claim in this Court on August 19, 2019, with a complaint raising the same claim of copyright infringement, by the same use of the same Photograph. PopMatters renewed my representation. In an August 28, 2019 email to Liebowitz, I detailed PopMatters' defense of licensed use that I had raised with him in 2018:

> Mr. Craig licensed the photo along with several others to Sony/Legacy, which published them in the booklet to the Miles Davis box set Miles at the Fillmore, released in March 2014. In turn, Sony/Legacy licensed the photo for promotional use by media outlets and sent the photograph to PopMatters for use online. By definition, a licensed publicity use is not an infringement.

Liebowitz did not mention the license defense in his response, or at any point. Instead, he made an offer to settle the claim for $10,000. I responded in part by sending him another Rule 68 offer for $800 the next day. He did not respond. Copies of an email chain reflecting communications I had with Liebowitz, including our August 28, 2019 and

3

August 29, 2019 emails, are on the docket in this action at Docket No. 14-13 and Docket No. 14-14.

6. An article by Jack Crager dated April 28, 2016 entitled "Photographing Miles Davis: A Day In The Life," about Craig's series of Miles Davis photographs, appeared on the website of *American Photo* magazine at https://www.americanphotomag.com/photos-miles-davis-day-in-life. A true and correct copy of the article is filed with the Petition as Exhibit B. As of this morning, the article is now available online at https://www.popphoto.com/american-photo/photos-miles-davis-day-in-life/. The article reported that Craig took the photographs as part of "a prearranged assignment for *Zygote* magazine":

> In the spring of 1970, on a prearranged assignment for *Zygote* magazine, photographer Glen Craig and a music writer showed up at the home of Miles Davis on Manhattan's Upper West Side. … Over several weeks Craig photographed Davis in various settings. … Culminating with a legendary set of shows at New York's Fillmore East in June of 1970, Craig's time with Davis was an artistically fertile period [for Davis]. …

The *American Photo* article further reported that a 2014 box set of Miles Davis' Fillmore recordings drew on Craig's series of Miles Davis photographs, which "had sort of been tossed to the side" beforehand:

> Much of [Miles Davis'] creativity finally surfaced in a 2014 box set covering the band's five-date Fillmore East and Fillmore West performances in their entirety. Miles at the Fillmore: The Bootleg Series Vol. III heavily drew on Craig's photography and created a demand for his exhibit, which debuted at Photokina 2014 and continues to travel. "Before that project these photos had sort of been tossed to the side," Craig says.

7. A press release dated January 23, 2014, on Legacy Recordings' Miles Davis website, where it remains available online at https://www.milesdavis.com/news/miles-at-the-fillmore-miles-davis-1970-the-bootleg-series-vol-3-4cd-box-set-to-be-released-march-25-2/, announced that a four-CD box set of recordings from the Fillmore concerts, *Miles at the Fillmore – Miles Davis 1970: The Bootleg Series Vol. 3* ("*Fillmore*"), would be

4

released on March 25, 2014. A true and correct copy of the press release is filed with the Petition as Exhibit C.

8. By an agreement dated February 18, 2014, Craig gave Sony Music Entertainment a non-exclusive license to use the Photograph and twelve of his other Davis photographs "inside the music packaging" of Legacy Recordings' Miles Davis *Fillmore* release, and further licensed the Photograph and one of the other twelve "for publicity." Paragraph 2 of the license provided that the rights Craig conveyed included the right to use the photographs in "promotional, advertising, marketing and promotional merchandising (i.e., not for resale) materials, perpetually and throughout the universe." A true and correct copy of the license is filed with the Petition as Exhibit D.

9. One photograph attributed to Craig appears on the back cover of the *Fillmore* digipak. Twelve other photographs attributed to Craig, including the Photograph, appear in the *Fillmore* booklet. A true and correct copy of the *Fillmore* booklet is filed with the Petition as Exhibit E.

10. Upon information and belief, Legacy Recordings made the Photograph available for publicity purposes and expressly permitted "editorial uses" by "Internet review outlets" among others. A true and correct copy of the Photograph bearing Legacy's logo and licensing terms is filed with the Petition as Exhibit F.

11. Tad Richards, a jazz critic who interviewed Craig at an exhibit of his Miles Davis series, reported that "Peter Knobler … originally commissioned the Craig photo essay." Tad Richards, *A Day in the Life of Miles Davis*, Listening to Prestige (May 7, 2016). A true and correct copy of Richards' blog post on the exhibit is filed with the Petition as Exhibit G. His post remains available online at http://opusforty.blogspot.com/2016/05/a-day-in-life-of-miles-davis.html. Peter Knobler was an editor at *Zygote*, as he stated in the introduction to Peter Knobler & Greg Mitchell eds., *Very Seventies: A Cultural History of the 1970s from the Pages of Crawdaddy* p. 16 (Simon & Schuster 1995): "P.K. [Peter

        Knobler] had freelanced for the original *Crawdaddy!* and G.M. [Greg Mitchell] had written for *Rolling Stone*. We had met, appropriately enough, in 1970, the very beginning of the decade, as editors of *Zygote* magazine in New York City. (You had to be there.)"

12. A complaint filed by Liebowitz in another of Craig's copyright infringement actions identifies the Morrison Hotel Gallery as Craig's representative: "Craig is currently represented by the Morrison Hotel Gallery in New York and Los Angeles, which specializes in historical music photography." ECF No. 1 ¶ 25, *Craig v. Getty Images (U.S.) Inc.*, No. 1:17-cv-09916 (S.D.N.Y. filed Dec. 19, 2017). The bio of Craig on the Morrison Hotel Gallery website describes the genesis of his 1970 Davis series, in which he photographed Miles Davis several times culminating with the Fillmore East concerts, "for *Zygote* magazine," not independently.

    While photographing B.B. King in the late 60s, Columbia / CBS introduced Glen to Miles Davis in New York City. The record company wanted to cross Davis into a more mainstream music audience, and Glen and Miles developed a trusting relationship that allowed the photographer to photograph Davis at home, at the gym, and in the studio. Glen went on to photograph Miles in 1970 for Zygote magazine, which ran an 18-page feature on the musician, including many of the photos shown here, of three weeks Craig spent with Miles Davis, leading up to and including his performances in June 1970 at the Fillmore East.

    That Morrison Hotel Gallery bio of Glen Craig remains available on its website at https://www.morrisonhotelgallery.com/photographers/U8B7GE/Glen-Craig.

13. Ed Gallucci, another *Zygote* photographer, later described the process by which *Zygote* assigned work: "They would call me up and say, 'You want to go shoot Rod Stewart? You want to go shoot Muhammad Ali?' I was hooked up with a writer and they would send us out to do an interview." He also explained that he had been hired as a freelancer for *Zygote* by editor Peter Knobler. Mr. Gallucci's description of that process remains available on his website at http://www.edgallucciphotography.com/site/wp-content/uploads/2013/10/gallucci-Independent9-20-copy.pdf.

6

14. *Zygote* launched in 1970 and covered post-Woodstock music and counterculture in the shadow of such precursor magazines as *Crawdaddy!* and *Rolling Stone* until folding in 1971, after ten issues. The fifth issue of *Zygote* featured an interview with Miles Davis as the cover story, including more than a dozen photographs from Craig's Davis series. "The Prince of Darkness Also Brings Light," *Zygote* vol. 1 no. 5 pp. 25-40 (Aug. 12, 1970). The author of the profile was not credited in that issue. The profile indicates that at each site where Craig photographed Miles Davis that June—Davis' home, his recording studio, Gleason's Gym, and finally the Fillmore East—the author accompanied him. Upon information and belief, Peter Knobler wrote the profile and commissioned Craig to photograph the Davis series for *Zygote* magazine as a work for hire.

15. According to a PACER search I conducted this morning, Liebowitz is counsel of record in 748 copyright cases filed so far in 2019. Also according to PACER, 4,625 copyright cases have been filed in total nationwide in 2019. Accordingly, Liebowitz is behind more than 16.17 percent, or nearly one-sixth, of all copyright actions initiated in the United States so far in 2019.

16. By this Petition, PopMatters seeks an award of all attorneys' fees it incurred in this action, whether assessed as costs recoverable under 17 U.S.C. § 505 or "excess" attorneys' fees under 28 U.S.C. § 1927. PopMatters' attorneys' fees have been reasonable and reasonably incurred. PopMatters spent a reasonable amount of time on the issues Craig raised and abandoned in this action. Filed herewith as Exhibit K is a true and correct itemized statement of attorney services, based on contemporaneous billing records, that accurately reflects work I have performed on behalf of PopMatters in connection with this action, for which PopMatters seeks to recover its incurred attorneys' fees by this Petition. I personally extracted all data from the client billing records and organized the information into the statement filed as Exhibit K. The statement reflects the

7

        dates the work was performed, a detailed description of the work performed, and the time expended to the nearest tenth of an hour.

17.    The time recorded in Exhibit K was reasonably incurred. Throughout my representation of PopMatters, I have strived to minimize fees, costs and expenses and avoid any unnecessary hours or duplication of effort. I have personally reviewed the time records being submitted in this Petition and eliminated entries that might potentially be seen as excessive, duplicative, or unproductive. PopMatters' counsel staffed and managed the litigation as efficiently as possible and did not duplicate responsibilities. In the exercise of billing discretion, I have excluded any time from the statement of services for associates' work on this matter. After my careful review of the time records, I believe that Craig and Liebowitz's improper filings and pursuit of this second action necessitated all of the time PopMatters is submitting for compensation.

18.    I have also excluded all time incurred in the first action. In support of PopMatters' motion for attorneys' fees under Rule 41(d) on October 18, 2019, I submitted different time records than submitted herewith, filed at Docket No. 14-16 in this action, reflecting time I had worked on both the first action and on this action, up to that point. The difference is because PopMatters now seeks an award of all fees expended in this action; while in the Rule 41(d) motion, PopMatters sought only compensation for time incurred that would serve no purpose in this action, such as time spent addressing personal jurisdiction and venue, and issues raised by the copyright registration that, after dismissing this action, Liebowitz conceded did not apply to the Photograph. Furthermore, I have excluded from the billing records and this petition all time spent between October 21, 2019 and November 4, 2019, all of which is allocated to preparing the fee motion filed in the first action. All time entries expended on, and requested in, the first action are excluded from the time records in Exhibit K.

19. I have practiced as a civil litigator since 2005, when I received my Juris Doctor degree from Columbia Law School. I served as a litigation associate at Hughes Hubbard & Reed LLP in New York from 2005 to 2007 and at Goodwin Procter LLP in Boston from 2007 to 2009, and as a co-founder and partner at Booth Sweet LLP from 2010 to 2019 before launching Dan Booth Law LLC this year. I have substantial experience in intellectual property litigation, which has been the primary focus of my legal practice since 2007. Since 2010, my practice has been concentrated on litigation of intellectual property and free speech issues, chiefly involving copyrights, trademarks, domain name disputes, defamation, and intermediary liability issues.

20. I charged PopMatters for my services in this action at my standard rate of $425 per hour. In 2013, in a case in the Southern District of Illinois, my client Anthony Smith was awarded all of his fees from the inception of suit under 28 U.S.C. § 1927 at the $409 per hour rate I then charged. *Lightspeed Media Corp. v. Smith*, No. 12-cv-889, 2013 U.S. Dist. LEXIS 168615, *19 (S.D. Ill. Nov. 27, 2013), *aff'd*, 761 F.3d 699 (7th Cir. 2014). The District Court Judge presiding in that case commented, "that's what you call bargain rates around here." *Id.*, ECF No. 101 at 17:11-13 (S.D. Ill. filed Dec. 10, 2013) (hearing transcript). My current billing rate of $425 per hour represents a modest increase of less than 4% over the $409 per hour rate awarded in that case six years ago.

21. My billing rate of $425 per hour, agreed upon with PopMatters, is well within the usual range charged in intellectual property litigation by similarly experienced attorneys in this Court. In the Chicago area, according to the American Intellectual Property Law Association's (AIPLA) biennial survey, the average rate charged by partners in intellectual property matters is $562 per hour and the rate for the first quartile (25%) of such attorneys is $453 per hour. A true and correct copy of pages excerpted from the AIPLA Report of the Economic Survey 2017 is filed as Exhibit J. My current billing rate is also reasonable compared to the $425 per hour rate claimed by Liebowitz in this action.

9

22. Overall, by this petition, PopMatters seeks to recover $28,050 of the attorney's fees it has incurred and expended in this action for 66 hours of my time at $425 per hour. That includes all 39.2 hours of time incurred on the case while it was pending in this Court, and 26.8 hours of time incurred pursuing a pre-motion agreement under LR 54.3 and preparing the fee petition, which is also compensable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 12, 2019.

*/s/ Dan Booth*

---

Dan Booth (admitted *pro hac vice*)
Dan Booth Law LLC
60 Thoreau Street #121
Concord, MA 01742
dan@danboothlaw.com

## CERTIFICATE OF SERVICE

  I hereby certify that on this November 4, 2019, the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be served via first-class mail to any identified non-registered participants for whom a mailing address is provided.

                 / s /  Scott Kane Stukel